Affirmed and Opinion filed July 22, 2008








Affirmed and Opinion filed July 22, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NOS. 14-07-00129-CR,
14-07-00130-CR, 14-07-00131-CR

____________

 

DEAUNDREY LAVAL WOOTEN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 230th
District Court

Harris County, Texas

Trial Court Cause Nos. 1093655,
1093656, 1093657

 



 

O P I N I O N

Appellant Deaundrey Laval Wooten appeals his convictions
for intoxication manslaughter, challenging the legal and factual sufficiency of
the evidence and alleging error by the trial court in (1) admitting allegedly
unreliable expert testimony regarding appellant=s blood-test
results, accident reconstruction, and drug recognition, (2) denying appellant=s requested jury
instruction as to criminally negligent homicide, (3) admitting appellant=s statements made
to medical personnel, and (4) denying appellant=s motion to quash
an enhancement paragraph in the indictment.  We affirm.








I.  Factual and Procedural Background

On a street in front of a bar, several people witnessed a
gold-colored vehicle driven by appellant speed down the street and swerve. 
Appellant=s car hit two pedestrians who were trying to cross the
street.  Both people died.  Appellant also hit a parked car on the side of the
road and killed a woman who was standing by that car. 

Appellant=s car flipped onto nearby railroad tracks
and burst into flames.  Appellant walked to his girlfriend=s house, which was
located in the vicinity of the accident.  Appellant=s girlfriend
called 9-1-1 to summon help for the treatment of appellant=s broken arm.

Paramedics examined appellant and took him to a hospital
for treatment.  On the way to the hospital, appellant indicated that he had
been injured in a car wreck involving two Asian men in a car.  Appellant
alleged these men ran his car into a ditch.  Appellant made statements to a
paramedic about drinking alcohol that evening and smoking marijuana. Appellant
also questioned the paramedic about an accident on Almeda Road, the one in
which appellant was involved.

At the hospital, a nurse, at a doctor=s request, took
appellant=s blood and urine samples for treatment purposes. 
Appellant=s blood-alcohol level was .280 and his urine sample
tested positive for marijuana and cocaine.  In response to the nurse=s questions during
appellant=s treatment, appellant revealed that he had Aa little too much
to drink@ that evening and
admitted to having used marijuana.  A different nurse drew a second blood
sample from appellant in the presence of a police officer, as mandated by the
Texas Transportation Code.

Those who treated or encountered appellant that evening,
including appellant=s girlfriend, each described how his
breath smelled of alcohol or how he exhibited physical attributes of a person
who is intoxicated, such as slurred speech and drowsiness.  Appellant=s girlfriend, a
nurse, and the paramedic all believed appellant was intoxicated or impaired.








Police officers determined from the tire marks on the road
that appellant had not engaged his brakes before hitting the pedestrians in the
street or the parked car.  Tire marks indicated that the car slid into the
parked car.  A police officer, trained as an accident reconstructionist,
determined that appellant=s speed at the scene was 77 miles per hour
in a 45 miles-per-hour zone.

The medical examiner determined that the complainants died
of multiple blunt force injuries sustained in the collision.  The legs of two
complainants were severed by the bumper of appellant=s vehicle.  The
other complainant died when he was severed at the waist after having been hit
by appellant=s vehicle and tossed into the air, falling through the
windshield of appellant=s vehicle.

Appellant was charged by indictment with three counts of
intoxication manslaughter, to which he pleaded Anot guilty.@  A jury convicted
him of intoxication manslaughter on each count.  The trial court sentenced
appellant to forty-five years= confinement for each offense and ordered
the sentences to run concurrently.

II.  Issues and Analysis

A.      Is the
evidence legally and factually sufficient to support appellant=s convictions?

In his first issue, appellant challenges the legal and factual
sufficiency of the evidence to support his convictions for intoxication
manslaughter because he alleges the State failed to prove that his intoxication
caused the deaths of the deceased.  Appellant also alleges that the deceased
pedestrians= presence and a motorcycle severed any Abut for@ causal
connection.  Appellant points to the following evidence for support:  (1)
testimony that appellant lost control of his vehicle only because a motorcycle
turned in front of appellant and that appellant would not have hit the
complainants had appellant not swerved to avoid colliding with the motorcycle,
and (2) testimony that two complainants, who were hit while standing in the
center of the road, placed themselves in danger by crossing the street on foot.









In evaluating a legal‑sufficiency challenge, we view
the evidence in the light most favorable to the verdict.  Wesbrook v. State,
29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether
we, as a court, believe the State=s evidence or
believe that appellant=s evidence outweighs the State=s evidence.  Wicker
v. State, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984).  The verdict may not
be overturned unless it is irrational or unsupported by proof beyond a
reasonable doubt.  Matson v. State, 819 S.W.2d 839, 846 (Tex. Crim. App.
1991).  The jury, as the trier of fact, Ais the sole judge
of the credibility of the witnesses and of the strength of the evidence.@  Fuentes v.
State, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999).  The jury may
choose to believe or disbelieve any portion of the witnesses= testimony.  Sharp
v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  When faced with
conflicting evidence, we presume the trier of fact resolved conflicts in favor
of the prevailing party.  Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim.
App. 1993).  Therefore, if any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt, we must affirm.  McDuff
v. State, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).








In contrast, when evaluating a challenge to the factual
sufficiency of the evidence, we view all the evidence in a neutral light and
inquire whether we are able to say, with some objective basis in the record,
that a conviction is Aclearly wrong@ or Amanifestly unjust@ because the great
weight and preponderance of the evidence contradicts the jury=s verdict.  Watson
v. State, 204 S.W.3d 404, 414B17 (Tex. Crim.
App. 2006).  It is not enough that this court harbor a subjective level of
reasonable doubt to overturn a conviction that is founded on legally sufficient
evidence, and this court cannot declare that a conflict in the evidence
justifies a new trial simply because it disagrees with the jury=s resolution of
that conflict.  Id. at 417.  If this court determines the evidence is
factually insufficient, it must explain in exactly what way it perceives the
conflicting evidence greatly to preponderate against conviction.  Id. at
414B17.  Our
evaluation should not intrude upon the fact-finder=s role as the sole
judge of the weight and credibility given to any witness=s testimony.  See
Fuentes, 991 S.W.2d at 271.  In conducting a factual‑sufficiency
review, we discuss the evidence appellant claims is most important in allegedly
undermining the jury=s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).

A person commits the offense of intoxication manslaughter
if that person (1) operates a motor vehicle in a public place, (2) while
intoxicated,[1]
and (3) by reason of that intoxication, causes the death of another person by
accident or mistake.  Tex. Penal
Code Ann. ' 49.08(a) (Vernon 2003); Garcia v.
State, 112 S.W.3d 839, 852 (Tex. App.CHouston [14th
Dist.] 2003, no pet.).  It is not enough that operation of a motor vehicle,
even when operated by an intoxicated person, causes death; rather, the State
must prove that a defendant=s intoxication caused the fatal result.  See
Daniel v. State, 577 S.W.2d 231, 233B34 (Tex. Crim.
App. 1979); Glauser v. State, 66 S.W.3d 307, 313 (Tex. App.CHouston [1st
Dist.] 2000, pet. ref=d).








In this case, evidence shows that appellant drove a motor
vehicle at thirty miles over the posted speed limit on a public street.  The
record reflects testimony from several witnesses that while appellant was at
the wheel, his vehicle swerved and collided with the three complainants. 
Autopsy reports indicate that the complainants died of injuries from the impact
of appellant=s vehicle.  Appellant=s girlfriend as
well as  a nurse and a paramedic each testified that appellant=s breath smelled
of alcohol.  A nurse testified that appellant=s slurred speech,
drowsiness, and odor of alcohol showed that appellant was intoxicated or
impaired.  Furthermore, appellant=s blood-alcohol
concentration of 0.280 was more than three times the amount that constitutes
intoxication in the Penal Code.  See Tex.
Penal Code Ann. ' 49.01(2)(B).  Appellant=s own admissions
to treating medical personnel[2]
of drinking Atoo much@ alcohol or
smoking marijuana indicate that appellant was intoxicated at the time of the
accident.  Finally, the record contains testimony from a law enforcement
officer, who is trained in drug recognition for driving-while-intoxicated (ADWI@) related
investigations, that excessive speeding, failure to brake, and lack of evasive
action are typical of drivers with intoxication levels similar to appellant=s blood-alcohol
levels, which served as one of the causes of the accident.[3]








Appellant argues the evidence is insufficient to show that
his intoxication caused the deaths because other evidence demonstrates that he
swerved to avoid a motorcycle that cut him off.  Under the Texas Penal Code, Aa person is
criminally responsible if the result would not have occurred but for his
conduct, operating either alone or concurrently with another cause, unless the
concurrent cause was clearly sufficient to produce the result and the conduct
of the actor clearly insufficient.@  Tex. Penal Code Ann. ' 6.04(a) (Vernon
2003); Garcia, 112 S.W.3d at 852.  Whether such a causal connection
exists is a question for the jury=s determination.  See
Hardie v. State, 588 S.W.2d 936, 939 (Tex. Crim. App. 1979); Thomas v.
State, 756 S.W.2d 59, 61 (Tex. App.CTexarkana 1988,
pet. ref=d).  The State
must prove the causal connection between appellant=s intoxication and
the complainants= deaths.  See Daniel, 577 S.W.2d at
233B34; Glauser,
66 S.W.3d at 313.  A jury may draw reasonable inferences regarding the ultimate
facts from basic facts.  Lacour v. State, 8 S.W.3d 670, 671 (Tex. Crim.
App. 2000); Garcia, 112 S.W.3d at 853.  Circumstantial evidence may be
used to establish a causal connection.  Garcia, 112 S.W.3d at 853.

ABut for@ causation, as
referred to in section 6.04(a) of the Texas Penal Code, must be established
between an accused=s conduct and the resulting harm.  See
Robbins v. State, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986).  When
concurrent causes are present, the Abut for@ requirement is
satisfied when either (1) the accused=s conduct is
sufficient by itself to have caused the harm; or (2) the accused=s conduct coupled
with another cause is sufficient to have caused the harm.  Id.  If an
additional cause, other than an accused=s conduct is
clearly sufficient by itself to produce the result, the accused=s conduct by
itself is clearly insufficient, then the accused cannot be convicted.  Id.  

In this case, appellant claims to have swerved to avoid
colliding with a motorcycle, which he alleges breaks any chain of causation;
however, the record contains witness testimony that neither a motorcycle nor
pedestrians blocked appellant=s passage on the street.  The jury was
free to believe or disbelieve any portion of the witnesses= testimony, and we
presume the jury resolved conflicts in favor of the prevailing party.  See
Sharp, 707 S.W.2d at 614; Turro, 867 S.W.2d at 47.  Moreover, even
if other factors contributed in some way to the accident, these factors were
not clearly sufficient to cause the fatalities in this case.  See Martinez
v. State, 66 S.W.3d 467, 471 (Tex. App.CHouston [1st
Dist.] 2001, pet. ref=d); Glauser, 66 S.W.3d at 313
(determining evidence was legally and factually sufficient to prove causation
by appellant=s intoxication because testimony reflected that
someone in Afull command of his mental and physical faculties
while driving@ at the rate of speed the appellant claimed to have
been driving would have been able to avoid hitting the disabled vehicle).








Based on the evidence proffered by the State, a reasonable
fact-finder could have found beyond a reasonable doubt that appellant operated
a motor vehicle on a public street at a time when he was intoxicated, because
appellant had a strong odor of alcohol on his breath and exhibited signs of
intoxication, such as drowsiness and slurred speech, and he had a blood-alcohol
concentration of .08 or more.  See Tex.
Penal Code Ann. '' 49.08(a), 49.01(2)(B); Garcia, 112
S.W.3d at 854.  Additionally, we hold that a fact-finder reasonably could have
found that Abut for@ appellant=s intoxication,
the complainants= deaths would not have occurred.  Tex. Penal Code Ann. '' 6.04, 49.08(a);
Garcia, 112 S.W.3d at 854. Viewing the evidence in the light most favorable
to the verdict, a rational trier of fact could have found the essential
elements of intoxication manslaughter beyond a reasonable doubt. See McDuff,
939 S.W.2d at 614; Wesbrook, 29 S.W.3d at 111; Garcia, 112 S.W.3d
at 854; see also Adams v. State, No. 2-05-379-CR, 2007 WL 495190, at *13
(Tex. App.CFort Worth Feb. 15, 2007, pet. ref=d) (mem. op., not
designated for publication).  Therefore, the evidence is legally sufficient to
sustain appellant=s convictions.  See Garcia, 112
S.W.3d at 854; Hale v. State, 194 S.W.3d 39, 43 (Tex. App.CTexarkana 2006, no
pet.); Martinez, 66 S.W.3d at 470; Glauser, 66 S.W.3d at 311;
Westbrook v. State, 697 S.W.2d 791, 793 (Tex. App.CDallas 1985, pet.
ref=d).

Viewing the evidence in a neutral light, we are not able to
say with some objective basis in the record that appellant=s convictions are
clearly wrong or manifestly unjust because the great weight and preponderance
of the evidence contradicts the jury=s verdict.  See
Watson, 204 S.W.3d at 417; Garcia, 112 S.W.3d at 852; Martinez,
66 S.W.3d at 471; Glauser, 66 S.W.3d at 311.  We hold that the evidence
is factually sufficient to support appellant=s convictions.  See
Martinez, 66 S.W.3d at 471; Glauser, 66 S.W.3d at 311.

Because the evidence is legally and factually sufficient,
we overrule appellant=s first issue.

 

 








B.      Did the trial court err in
admitting expert testimony regarding the results of appellant=s blood test, accident
reconstruction, and drug recognition?

In his second issue, appellant complains that the trial
court erred in admitting expert testimony concerning the results of appellant=s first blood
test, the field of drug recognition, and reconstruction of the accident. 
Before trial, appellant filed a motion to suppress the results of the two blood
samples drawn at the hospital.[4] 
Appellant also requested a hearing under Texas Rule of Evidence 705 for the
trial court to determine the admissibility of testimony from the State=s expert witnesses
involving the blood samples, reconstruction of the accident, and drug
recognition. 

At the Rule 705 hearing, three witnesses testified as to
how blood-alcohol results from a Dimension RXL Analyzer machine (hereinafter
referred to as ADimension RXL@) are processed
and analyzed.  The Dimension RXL is manufactured by Dade and was used to
perform appellant=s first blood test.  The trial court
denied appellant=s motion to suppress the blood-alcohol
results from the Dimension RXL by finding the results of the machine to be
reliable and determining that these witnesses could offer admissible testimony
concerning the blood-test results.  The trial court also deemed admissible
testimony from the State=s drug recognition expert concerning the
effects of marijuana and alcohol in a person=s body.  Finally, the
trial court deemed admissible expert testimony from the accident
reconstructionist regarding the speed of appellant=s vehicle at the
time of the accident.








Under Texas Rule of Evidence 702, if a witness possesses
scientific, technical, or other specialized knowledge that will assist a
fact-finder and if the witness is qualified as an expert by knowledge, skill,
experience, training, or education, then that expert may testify with an
opinion.  Tex. R. Evid. 702; Jensen
v. State, 66 S.W.3d 528, 542 (Tex. App.CHouston [14th
Dist.] 2002, pet. ref=d).  Expert testimony is admissible if (1)
the expert is qualified, and (2) the testimony is relevant and based on a
reliable foundation.  See Hartman v. State, 946 S.W.2d 60, 62 (Tex.
Crim. App. 1997).  To be reliable, evidence based on a scientific theory must
satisfy three criteria: (1) the underlying scientific theory must be valid; (2)
the technique applying the theory must be valid; and (3) the technique must
have been properly applied on the occasion in question.  Kelly v. State,
824 S.W.2d 568, 573 (Tex. Crim. App. 1992); see Russeau v. State, 171
S.W.3d 871, 881 (Tex. Crim. App. 2005); Hartman, 946 S.W.2d at 63. 

We review the trial court=s determination of
whether these requirements are met under an abuse-of-discretion standard.  Russeau,
171 S.W.3d at 881; Morales v. State, 32 S.W.3d 862, 865 (Tex. Crim. App.
2000).  Under this standard, a reviewing court will not disturb a trial court=s decision if the
ruling was within the zone of reasonable disagreement.  Bigon v. State,
252 S.W.3d 360, 367 (Tex. Crim. App. 2008); Hinojosa v. State, 4 S.W.3d
240, 250B51 (Tex. Crim.
App. 1999).

1.       Evidence
as to Appellant=s Blood-Test Results

According to evidence in our appellate record, the
Dimension RXL tests blood-alcohol content by separating blood serum from the
whole blood in a centrifuge, mixing an enzyme with the blood serum, and then
analyzing it for the alcohol content.  Appellant argues that the results of
blood tests performed on this machine are unreliable and that
gas-chromatography analysis is more reliable and accepted in the scientific
community. Appellant, however, offers no authority for this argument beyond
this assertion.  Appellant also complains that the experts failed to explain
how the enzymes used in the machine interacted with the alcohol in the blood
sample to calculate blood-alcohol content. 

 








Reliability of the Dade Dimension RXL Analyzer

Whether blood-alcohol results from the Dimension RXL are
reliable appears to be a matter of first impression in Texas courts.  Though no
Texas courts appear to have made express reference to the Dimension RXL, some
Texas courts have analyzed whether a blood-alcohol test using blood serum, as
in this case, rather than whole blood, and enzymes or a centrifuge is reliable.[5] 
Additionally, federal district courts have allowed blood-alcohol results from a
Dade Dimension Analyzer, finding such results to be reliable.[6]








Majid Mashal, a medical toxicologist, testified at the Rule
705 hearing that he analyzed appellant=s blood specimen
for blood-alcohol content using the hospital=s Dimension RXL. 
Mashal holds a bachelor=s degree in medical technology and the
necessary training to run blood and urine samples.  He also holds a master=s degree in
healthcare administration.  Mashal received one week of training on this
machine from Dade=s scientists and experts, who designed and
manufactured the Dimension RXL.  Mashal testified that he has conducted
thousands of blood tests on this machine and believes the testing procedures of
the Dimension RXL are reliable.  Mashal testified that the machine is a widely
accepted instrument in his scientific community, and it is approved by the Food
and Drug Administration (AFDA@).  Mashal
described how he received appellant=s blood sample in
a sealed package.  Mashal knows procedures that safeguard a blood sample from
contamination, and noted that appellant=s blood sample
showed no indication of contamination.  Mashal explained that the Dimension RXL
was working properly that day because he tested the machine for quality control
before starting his work.  The quality-control specimen showed the machine was
running correctly because the machine would not accept a blood specimen if a
quality-control specimen previously had failed, as shown by the machine=s programmed
message, until the problem was corrected.  Mashal described how the machine
uses a centrifuge to separate blood serum from the blood sample and how a probe
picks up the blood serum or plasma and tests the specimen.  The blood serum is
analyzed after mixing with an agent to produce results for alcohol.  Mashal
admitted that he did not know the technicalities of exactly how the machine
internally detects alcohol.  Mashal, in applying proper techniques as learned
from his training and experience, ran appellant=s blood sample
through the machine and received 0.280 as appellant=s blood-alcohol
results.  According to Mashal, the procedures used with this machine are
generally accepted in his scientific community and are proven to be valid. 
Mashal also described how he similarly tested appellant=s urine on the
same machine and received positive results for marijuana and cocaine.








Roger Petty, a laboratory supervisor for the hospital that
tested appellant=s blood-alcohol content, testified at the
Rule 705 hearing that he has not personally used the Dimension RXL.  According
to Petty, the Dimension RXL and its underlying methodologies are FDA-approved. 
The machine at this hospital is certified and remains up-to-date in its
certification.  Petty explained that he is not familiar with the technical
aspects of the machine=s analysis, for example, how the machine
detects alcohol.  However, on cross-examination, Petty described how test packs
mix with the plasma of a specimen to produce a chemical reaction.  The machine
quantitatively measures the reaction, though Petty could not say what part of
the machine actually measures this reaction.  Petty explained that the results
from this machine are used for medical purposes, and Petty was not familiar
with any limitations on the use of the machine=s results for
forensic purposes, as appellant=s trial counsel suggested.  Petty
confirmed that no blood samples can be run on the machine when a
quality-control test fails, and quality control was up to date on this machine
at all relevant times.  Petty
described how the machine runs quality-control tests daily and for each shift,
and such tests must produce results within a certain range mandated by Dade in
order to pass.  Although Petty indicated that a rate of error exists on the
machine, he was not familiar with the exact rate of error.  Petty indicated
that as long as the quality-control tests are successful, for medical purposes,
there is no need to know the rate of error for the machine.  Petty also
indicated that results from this test may not be as accurate as results from
gas chromatography.[7] 
After Petty=s testimony, the trial court explained that the State
had not offered sufficient testimony from experts surrounding the science of
the Dimension RXL, but the trial court did not specifically grant or deny
appellant=s motion.








The State offered testimony from Jima Ojha, who serves as
the general director of pathology for the hospital that analyzed appellant=s blood sample on
the Dimension RXL.  Ojha explained that a tube containing a blood sample is
placed in the machine=s analyzer, and a centrifuge spins the
blood and separates the blood serum.  The serum goes into an analyzer and mixes
with a reagent, causing an enzymatic reaction.  The absorbents of the final
product are read by the machine using two filters.  The machine uses an
automatic filter that reads absorbent-matter levels by using the machine=s photometer.  The
photometer is like a lens that reads absorbent matter at two different levels
to verify the accuracy of the enzymatic reaction.  If a patient has any toxins,
the presence of such absorbent matter will be read by the machine=s photometer.  The
machine then registers an automatic reading, and the machine will give a final
result that has a reference range to be verified against the hospital=s lab information
system.

The principles implemented in this machine are photomatic
absorbents, as opposed to gas chromatography, and such theories are generally
accepted in the scientific community.  Ojha explained that many hospitals use
this methodology.  According to Ojha, this machine was installed by Dade and
has been regulated by the hospital pathologist and Dade.  The trial court, for
purposes of the hearing, admitted, with no objection from appellant, the
hospital=s standard
operating-procedure manual for detecting alcohol, which, according to Ojha,
described in detail the science behind the machine.  Ojha admitted that she
relies on this manual for her day-to-day operations.  








Ojha received extensive training from Dade in using the
Dimension RXL.  Ojha also learned of the theories supporting the Dimension RXL
while earning her degree in medical technology.  Ojha explained that in
conducting daily, quarterly, and per-shift system checks of the machine, the
analyzer picks up a quality-control sample and the photomatic instrument
pipette verifies that all parts of the analysis are in proper working order. 
Ojha specifically explained that the machine=s operator does
not determine which tests to conduct on the sample; rather, the machine reads a
bar code on the blood sample=s tube that contains patient data, and
this bar code dictates which toxicology tests will be conducted on that blood
sample.  When the machine registers the results of a test, the operator simply
verifies the results but has no subjective input in the specimen=s analysis.  On
cross-examination, Ojha testified that because the machine registers only
positive numbers, and not negative numbers, the machine is Aabsolutely
accurate.@  If an error occurred or another substance interfered
in analyzing a sample, the machine would register an error code and could not
analyze the sample.

The proponent of scientific evidence must prove its
reliability by clear and convincing evidence.  Kelly, 824 S.W.2d at
573.  However, a Aparty seeking to introduce evidence of a
scientific principle need not always present expert testimony, treatises, or
other scientific material to satisfy the Kelly test.@  Hernandez v.
State, 116 S.W.3d 26, 28B29 (Tex. Crim. App. 2003).  Factors to be
considered in determining the reliability of scientific evidence include, but
are not limited to the following:  

(1)     the extent to which the underlying
scientific theory and technique are valid and accepted within the relevant
scientific community; 

(2)     the qualifications of the experts
testifying; 

(3)     availability of media accepting or rejecting
the underlying scientific theory or technique; 

(4)     the potential rate of error in the
technique; 

(5)     the availability of other experts to test
and evaluate the technique; 

(6)     the clarity with which the scientific theory
and technique can be explained in court; and 

(7)     the experience and skill of the person who
applied the technique in question.








See
Kelly, 824 S.W.2d at 573.  The trial court heard evidence on most of these
factors.  Each of the State=s experts detailed their training and
qualifications in their field and specified that the science implemented by the
Dimension RXL is accepted in their scientific and medical communities.  Ojha
described in detail how the methodology and scientific techniques of the
Dimension RXL worked to detect alcohol.  The operating manual on which Ojha
relies daily, details the scientific principles involved, as reflected in the
record.  Though no witness identified a specific rate of error for the machine,
each confirmed that the machine would not analyze any samples if an error code
registered on the machine during a quality-control test.  Finally, Mashal
testified that in analyzing appellant=s blood sample, he
implemented the same techniques he learned in his week-long training by the
Dade company in using the machine.  

Though appellant complains that the experts did not explain
how the enzymes interacted with the alcohol in the blood sample to calculate
the blood-alcohol content, the trial court was satisfied with Ojha=s testimony as to
the underlying scientific theory involving photomatic readings of the absorbent
matter created from an enzymatic reaction caused by mixing a reagent with blood
serum.  See Dean v. State, No. 04-97-00077-CR, 1998 WL 652322, at *2
(Tex. App.CSan Antonio Sept. 23, 1998, pet. ref=d) (not designated
for publication) (holding blood-alcohol results reliable despite expert=s acknowledgment
that she was Anot real familiar@ with the
technique testing with enzymatic acids).  Though reasonable minds may disagree,
it was within the zone of reasonable disagreement for the trial court to
conclude the State met the three Kelly factors by clear and convincing
evidence regarding the Dade Dimension RXL.  See Kelly, 824 S.W.2d at
573; Jessup, 2004 WL 2612958, at *4; Dean, 1998 WL 652322, at
*3.  Accordingly, the trial court did not abuse its discretion in allowing
appellant=s Dimension RXL blood-alcohol results or the
expert-witness testimony regarding appellant=s blood-test
results to be presented to the jury.  See Jessup, 2004 WL 2612958, at
*4.

2.       Drug-Recognition
Expert=s Testimony

Appellant next complains about the admission of testimony
from a drug-recognition expert, Houston Police Department Officer Francis
LaSalle.  Appellant complains that by allowing Officer LaSalle to testify about
the general characteristics of marijuana use on an individual, the trial court Aessentially
allowed LaSalle to testify that appellant was under the influence of marijuana.@








Officer LaSalle testified at the Rule 705 hearing that he
is the head of the impaired driving program for the Houston Police Department. 
As a drug-recognition expert, he knows and recognizes the effects of alcohol
and drugs in the human body.  He completed several extensive training courses
to learn the effects of chemicals on the body.  He became certified as a drug
recognition expert by taking a 152-hour course.  Officer LaSalle is certified
as an instructor to teach other drug-recognition experts, and he has taught
dozens of courses to experts from four states.  Officer LaSalle identified a
number of physical and physiological factors for determining whether a person
is under the influence of marijuana.  Officer LaSalle testified that such
methods in detecting drugs are scientifically validated and accepted in the
scientific community.  The scientific theories were certified by several major
research universities, and results of the scientific studies have been
published. Officer LaSalle testified that because the procedures for drug recognition
are standardized across the nation, the results are highly accurate.

Based on his own training and experience and his review of
appellant=s medical records, Officer LaSalle testified at the
Rule 705 hearing that the information within appellant=s hospital records
is consistent with signs of one under the influence of drugs or alcohol. 
Officer LaSalle indicated that appellant=s normal body
temperature and elevated pulse and blood pressure, as reflected in appellant=s hospital
records, are indicative of  being under the influence of marijuana.  Officer
LaSalle coupled this information with the presence of marijuana in appellant=s urine sample and
offered an expert opinion that there is a strong indication of appellant=s marijuana use. 

The trial court ruled that Officer LaSalle could testify to
general factors he looks for when determining whether a person is under the
influence of marijuana and that marijuana was found in appellant=s urine sample, as
reflected in appellant=s medical records.  However, the trial
court did not permit Officer LaSalle to testify that appellant was under the
influence of marijuana.  At trial, Officer LaSalle testified to the effects of
alcohol and marijuana on a person=s driving skills
who had the same level of intoxication, 0.280, that appellant had on the night
of the accident.








The record reflects that Officer LaSalle was qualified by
his training and experience in drug recognition.  See Tex. R. Evid. 702; Bumgarner v.
State, No. 12-05-00243-CR, 2006 WL 1917961, at *5 (Tex. App.CTyler July 12,
2006, pet. ref=d) (mem. op., not designated for publication). 
Moreover, the subject matter was appropriate testimony from a drug- recognition
expert because his testimony fit the evidence of this case.  See Rousseau v.
State, 855 S.W.2d 666, 687 (Tex. Crim. App. 1993).  Officer LaSalle=s testimony
assisted the jury in understanding how the use of marijuana and a blood-alcohol
level of 0.280 affect a person=s driving skills.  See Bumgarner,
2006 WL 1917961, at *5; see also Hartman, 946 S.W.2d at 62.  Though
reasonable minds may disagree, the trial court was within its discretion in
determining that Officer LaSalle=s testimony met
the three criteria of Kelly in that he testified that (1) the underlying
scientific theories for determining the effects of drugs and alcohol on a
person are valid; (2) the techniques in applying the theories are valid; and
(3) Officer LaSalle applied those theories to a person exhibiting similar
levels of intoxication and physiological symptoms as appellant.  See Kelly,
824 S.W.2d at 573.  Furthermore, Officer LaSalle did not testify that
appellant, personally, was under the influence of marijuana.  Therefore, the
trial court did not err in admitting Officer LaSalle=s testimony.

3.       Accident-Reconstruction
Expert=s Testimony

Finally, appellant claims the trial court erred in
permitting testimony from accident reconstructionist Houston Police Department
Officer James Tippy because he did not use the latest technology, a Vericom
machine, in calculating appellant=s speed. 
Appellant contends that a Vericom machine is the latest technology and is more
reliable than a drag sled, as used by Officer Tippy, but appellant offers no
authority for this conclusion beyond this assertion.








At the Rule 705 hearing, Officer Tippy testified that he
has taken intermediate and advanced courses in accident, speed, and crash
reconstruction.  He has more than three hundred hours of field experience in
accident reconstruction in his twenty-three years of service on the police
force.  He teaches police cadets basic accident-investigation skills.  Officer
Tippy explained how evidence from an accident offers numbers that can be
plugged into a formula for calculating speed.  Officer Tippy confirmed that
studies have verified the accuracy and scientific validity of this
methodology.  Moreover, these methods are accepted in the scientific community.

Officer Tippy explained that, by testing the stickiness of
the road and measuring the skid marks or yaw marks left by a vehicle, he can
determine the drag factor and calculate a car=s speed.  To
calculate speed or drag factor, or the surface coefficient, either a Vericom
machine or a drag sled can be used.  In this case, Officer Tippy used a drag
sled, a certified scale, and a mathematical formula to measure how much weight
the drag sled pulled in measuring the length of a yaw mark on the road. 
Officer Tippy has performed this procedure with yaw marks about fifty times. 
Regarding this accident, Officer Tippy measured the yaw mark and the radius of
the yaw mark.  Officer Tippy then entered these measurements, along with the
figure taken from the drag sled, into a mathematical formula that calculated a
velocity of 77.215.  Officer Tippy explained that he properly applied the
techniques and double-checked his measurements in calculating this speed and
that such procedures are scientifically validated throughout the country.  On
cross-examination, Officer Tippy claimed that the Vericom machine is not as
advantageous as the equipment he uses; and although the Vericom machines are
the Alatest and
greatest technology,@ drag sleds have been used for at least
fifteen years.








The State produced evidence that Officer Tippy=s education and
training in accident reconstruction qualifies him as an expert to testify to
this subject matter.  See Tex. R.
Evid. 702; DeLarue v. State, 102 S.W.3d 388, 399 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d).  Officer Tippy=s testimony
addressed the three criteria of the Kelly test in explaining how he
calculated appellant=s speed by using a drag sled.  See
Kelly, 824 S.W.2d at 573; DeLarue, 102 S.W.3d at 400.  Officer Tippy
attested to (1) the validity of the theory in using a drag sled underlying his
accident-reconstruction methodology; (2) the validity of the techniques he used
in applying the theory; and (3) that he specifically applied the techniques on
the occasion in question.  We conclude that the trial court was within its
discretion in allowing Officer Tippy to testify as to his calculations of
appellant=s speed based on his use of a drag sled.  See
DeLarue, 102 S.W.3d at 400; see also Kelly, 824 S.W.2d at 573. 
Therefore, we overrule appellant=s second issue.

C.      Did the trial court err in
denying appellant=s requested lesser-included offense
jury instruction for criminally negligent homicide?

In appellant=s third issue, he
argues the trial court erred in denying his requested jury instruction for the
offense of criminally negligent homicide, which appellant asserts is a
lesser-included offense of intoxication manslaughter.  Appellant=s requested charge
stated that Adriving too fast for the then existing conditions@ constituted
negligence.  The trial court denied appellant=s request.

An offense is a
lesser[-]included offense if:

(1) it is established by proof of the same or less than all the facts
required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less
serious injury or risk of injury to the same person, property, or public
interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less
culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an
otherwise included offense.

Tex. Code
Crim. Proc. Ann. art.
37.09 (Vernon 2006).








A defendant is entitled to every defensive issue raised by
the evidence.  Tex. Code. Crim. Proc.
Ann. art. 36.14 (Vernon 2007); Gowans v. State, 995 S.W.2d 787,
792 (Tex. App.CHouston [1st Dist.] 1999, pet. ref=d).  To warrant a
jury instruction on a lesser offense in the jury charge, a defendant must
demonstrate that (1) the elements of the lesser offense are contained within
the proof necessary to establish the charged offense as pleaded in the State=s indictment, and
(2) the record contains some evidence by which a jury rationally could conclude
that if the defendant is guilty, the defendant is guilty of only the lesser
offense and not the greater offense.  See Hall v. State, 225 S.W.3d 524,
535 (Tex. Crim. App. 2007) (applying Apleadings approach@ as sole test for
determining the first step in determining whether a party is entitled to a
lesser-offense instruction); Hayward v. State, 158 S.W.3d 476, 478 (Tex.
Crim. App. 2005); Rousseau, 855 S.W.2d at 673; Gowans, 995 S.W.2d
at 792.  

The statutory elements of intoxication manslaughter, as
modified by the particular allegations in the indictments, are as follows:

(1) appellant

(2) by accident or
mistake

(3) operated a motor
vehicle 

(4) in a public place

(5) while intoxicated

(a)     by not having the normal use of his mental
and physical faculties by reason of the introduction of alcohol or a
combination of alcohol and cannabinoid in his body

(b)     and by having an alcohol concentration of at
least 0.08 in his blood

(6) and as a result of
the intoxication, caused the death of another person

(7) by driving his motor vehicle into and causing it to
collide with the complainant.

See
Tex. Penal Code Ann. ' 49.08.  We
then compare these elements with the elements of the lesser-included offense of
criminally negligent homicide that could be included in that offense:

(1) appellant

(2) caused the death of
another

(3) by criminal
negligence








(a)     with respect to circumstances surrounding
his conduct or the result of his conduct when he ought to be aware of a
substantial and justifiable risk that the circumstances exist or the result
will occur.  The risk must be of such a nature and degree that the failure to
perceive it constitutes a gross deviation from the standard of care that an
ordinary person would exercise under all the circumstances as viewed from the
actor=s standpoint.

See Tex. Penal Code Ann. ' 19.05(a) (Vernon
2003) (defining criminally negligent homicide); id. ' 6.03(d) (Vernon
2003) (defining criminal negligence).  We then ask the question that Article
37.09(1) poses:  Are the elements of the purported lesser-included offense Aestablished by
proof of the same or less than all the facts required to establish the
commission of the offense charged@?  See Hall,
225 S.W.3d at 536.  The answer is that they are not.  The facts required to
prove the purported lesser-included offense include proof of a culpable mental
state, facts that are not the same as or less than the facts required to
establish the offense charged.  See id.








Because intoxication manslaughter requires no proof of
culpable mental state, it is, by statute, a strict liability crime; whereas
criminally negligent homicide requires a showing of a culpable mental state.  Reidweg,
981 S.W.2d at 406B07; see also Gowans, 995 S.W.2d at
793.  Proof of criminal negligence requires proof of a greater mental state
than intoxication manslaughter.  Reidweg, 981 S.W.2d at 406B07.  Because the
elements for criminally negligent homicide are not the same as or less than the
elements of intoxication manslaughter, as charged, criminally negligent
homicide cannot be a lesser-included offense of intoxication manslaughter.  See
Hall, 225 S.W.3d at 536; Gowans, 995 S.W.2d at 793.  In addition,
criminally negligent homicide is not a lesser-included offense under the other
three parts of article 37.09.  See Tex.
Code Crim. Proc. Ann. art. 37.09.  Accordingly, appellant has not
satisfied the first prong of the lesser-included offense test, making it
unnecessary to reach the second prong of the test.  See id.; Torres
v. State, 52 S.W.3d 285, 287 (Tex. App.CCorpus Christi
2001, no pet.).  A trial court is not obligated to instruct the jury on a
lesser-included offense when the conduct establishing the lesser offense was
not Aincluded@ within the facts
required to prove the charged offense.  See Irving v. State, 176 S.W.3d
842, 846 (Tex. Crim. App. 2005); Torres, 52 S.W.3d at 287.  Therefore,
we overrule appellant=s third issue.

D.      Did the trial court err in
admitting appellant=s statements to medical personnel?

In his fourth issue, appellant complains that the trial
court erred in admitting evidence regarding statements appellant made to a
paramedic and a nurse, each of whom treated appellant=s injuries. 
Appellant claims that the nurse=s and paramedic=s testimony as to
these statements are not within an exception to the hearsay rule because these
statements were not made for the purposes of obtaining medical treatment or
diagnosis.  Finally, appellant complains that the trial court erred in
admitting hospital records that contained statements appellant made to the
paramedic and nurse about being run off the road into a ditch because appellant
claims the statements were not obtained for medical purposes and are not
trustworthy.

We review a trial court=s decision to
admit or exclude evidence under an abuse-of-discretion standard.  Coffin v.
State, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994).  Under this standard, if
the trial court=s ruling was within the zone of reasonable
disagreement, we will not disturb the ruling.  Montgomery v. State, 810
S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh=g). 

1.       The
Paramedic=s Testimony








Appellant complains of the paramedic=s testimony at
trial that appellant admitted drinking alcohol and smoking marijuana and that
appellant admitted driving home from a bar, because appellant claims that these
statements do not fit within an exception to the hearsay rule for medical
diagnosis or treatment.  To preserve a complaint for appellate review, a party
must make a timely request, objection, or motion with sufficient specificity to
apprise the trial court of the complaint.  Tex.
R. App. P. 33.1(a); Saldano v. State, 70 S.W.3d 873, 886B87 (Tex. Crim.
App. 2002).  Appellant has not cited and we have not found any place in the
appellate record showing that appellant objected on hearsay grounds to the
paramedic=s testimony regarding these statements.[8] 
Therefore, appellant has waived this complaint.

2.       The Nurse=s Testimony

In his appellate brief, appellant cites the nurse=s pre-trial
testimony at a suppression hearing involving a blood sample.  Appellant,
however, failed to object to this testimony at trial.[9] 
See Tex. R. App. P. 33.1(a).  To preserve a
complaint for appellate review, a party must make a timely request, objection,
or motion with sufficient specificity to apprise the trial court of the
complaint.  Id.; Saldano, 70 S.W.3d at 886B87.  Appellant has
not cited and we have not found any place in the appellate record showing that
appellant preserved his complaint by objecting to this  testimony from the
nurse.








Even if appellant had preserved his complaint, he has
failed to adequately brief it in this court.  To present an issue for appellate
review A[t]he brief must
contain a clear and concise argument for the contentions made, with appropriate
citations to authorities and to the record.@  Tex. R. App. P. 38.1(h).  Appellant has not presented any argument in
support of this complaint.  He has not addressed any of the governing legal
principles or applied them to the facts regarding the nurse=s testimony;
instead, appellant has cited legal authority and argued that the trial court
erred in admitting the paramedic=s testimony.  See
King v. State, 17 S.W.3d 7, 23 (Tex. App.CHouston [14th
Dist.] 2000, pet. ref=d).  Accordingly, we hold that appellant
has waived error as to this particular testimony from the nurse.

3.       The
Hospital Records

Finally, appellant complains the trial court erred in
admitting appellant=s hospital records, contained in AState=s Exhibit 1,@ which refers
twice to statements made by appellant to both the paramedic and the nurse
regarding how the accident happened.  Appellant complains that his statements
in the records were not obtained for medical purposes and are not trustworthy. 
The hospital records contain notes from both the paramedic and nurse that
appellant told each of them that he was involved in a motor vehicle accident
when he was run off the road into a ditch.  The records of which appellant
complains were the subject of a pre-trial suppression hearing, and appellant
objected to the records during the following exchange:

[DEFENSE COUNSEL]:  Your Honor, the only objection I would have is a
couple of places on here where [appellant] makes statements.  One is the
statement he made to the ambulance driver in which there is a location he talks
about.  He was inquiring about [a] motor vehicle accident on Almeda.  I would
object to that as hearsay and not made for the purpose of any kind of medical
reason.

There is a second blurb here under survey.  He says:
Aa little too much.@  When [the nurse] asked him about
alcohol he said, Aa little too much tonight.@  I would object to that entry as
well.  Other than that, I have no objections.[10]








[PROSECUTOR]:  Judge, basically on here these are the purposes for
medical diagnosis.  The survey was asked so they could get an accurate account
of what he had done that night so they knew how to treat him properly.

[TRIAL COURT]:  Until the Court hears evidence relative to the taking
of those statements, then I am going to sustain the objection as to those
portions in State=s Exhibit 1 at this time.

. . .

[DEFENSE COUNSEL]:  Otherwise, I have no objection.

[TRIAL COURT]:  State=s [Exhibit] 1 is admitted without objection with the exception of those
portions that were drawn to the Court=s attention by defense counsel.  The objection as to those
portions are [sic] sustained.

At the end of the hearing, the State moved to enter the
records into evidence in their entirety in the following exchange:

[PROSECUTOR]:  Judge, there=s one more matter I=d like to take up with regard to State=s Exhibit 1.  You admitted it into
evidence for both purposes of trial and as [sic] hearing and then you
temporarily said you would not admit two pages, one with the statement that was
made by C to the [paramedic] and the other
the one to [sic] in regards to the statement that he made from [sic] medical
purposes to [the nurse].  And she came in and they both testified these were
for medical purposes only and they are in the medical records and at this time
we=d like to offer [a] complete
medical record, State=s Exhibit 1 in its entirety.

[DEFENSE COUNSEL]:  Judge, my only position on those particular
statements were [sic] made toward any medical purposes, and we would ask that
any mention in the medical records, any statement by [appellant] in the medical
records about what he had to drink or what he might have smoked or how this
might have occurred not be allowed into evidence.

[TRIAL COURT]:  I do recall the [paramedic] and the nurse testifying to
statements that the defendant allegedly made to them.  I do not recall them
being asked about those specific statements.

. . . 








[TRIAL COURT]:  If they are able to testify to those specific
statements, then I will allow if [sic] those statements that you are now
proffering if they testify those statements were made for medical treatment. 
So far I know they testified generically about things he said to them, but I
don=t recall them being asked about
those specific things.

Appellant
did not secure a ruling on that issue at the hearing.  At trial, the paramedic
and the nurse each testified without objection that appellant told each of them
that on his way home from a bar, he had been in a wreck and had been run off
the road.  After each of them testified to this information, when the hospital
records were actually offered during the trial, the following exchange
occurred:

[DEFENSE COUNSEL]: There were a couple of things that I had checked
into the other day and these records that you sort of took under consideration
but have not decided about yet.

The first is on the page involving notes from the
[paramedic] talking about where he had been that night.  I object to this
portion . . . this deals with statements he made about driving into a ditch.  I
object to that based on that it=s not made for the purposes C they were taken for purposes of medical reasons, so we
object to this as hearsay.

. . .

[PROSECUTOR]:  And he testified to that.

[TRIAL COURT]:  Hold up.  It appears to me the statement if these are
statements, this was written by [the paramedic].  He testified to this.

[PROSECUTOR]:  Okay.  We will get that taken care of.

[TRIAL COURT]:  At this time, to redact those statements.

[DEFENSE COUNSEL]:  The next portion that I object to is a blurb.  It
is on the page entitled secondary survey . . . , and there is a notation here
about under alcohol, it says a little too much tonight.  I would object to that
as not taken for the purposes of medical reasons.  Also under 403 I believe it
is substantially more prejudicial than probative.

[TRIAL COURT]:  Well, the objection on that portion is sustained.

[DEFENSE COUNSEL]:  And one more thing.

[PROSECUTOR]:  I will redact this.

[DEFENSE COUNSEL]:  Okay.  I think we have an agreement as to the other
ones.  Thank you, Judge.

[TRIAL COURT]:  I sustain the objection to the first part.








All of appellant=s objections to
his statements made to the paramedic about how the accident occurred as
reflected in the hospital records either were sustained or resolved by agreed
redactions.  To preserve error for our appellate review, appellant must have
made a timely, specific instruction and obtained an adverse ruling from the
trial court, and the issue on appeal must comport with the objection made at
trial.  See Turner v. State, 805 S.W.2d 423, 431B32 (Tex. Crim.
App. 1991).  Because appellant did not receive an adverse ruling, appellant has
not preserved the issue for our review as to the statements appellant made to
the paramedic as contained in the hospital records.  See Tex. R. App. P. 33.1; Turner,
805 S.W.2d at 431B32.

As to any statements appellant made to the nurse about how
the accident occurred as contained in the hospital records, appellant failed to
object to these statements.  See Tex.
R. App. P. 33.1.  Furthermore, even if we were to presume the trial court
erred in admitting the statements from the nurse=s notes, no harm
ensued because the nurse already had testified without objection to these
statements.  See Willis v. State, 785 S.W.2d 378, 383 (Tex. Crim. App.
1989) (holding harmless erroneous admission of evidence when the same facts had
already been introduced through other admissible evidence without objection). 
Therefore, we overrule appellant=s fourth issue.

E.      Did the trial court err in
denying appellant=s motion to quash an enhancement
paragraph of the indictment?








In his fifth issue, appellant argues the trial court erred
in denying his motion to quash  the enhancement paragraph of the indictment. 
For each of the three indictments, the State sought enhancement of appellant=s sentence based
on a 1991 felony conviction of the unauthorized use of a motor vehicle and a
1994 conviction for possession of a controlled substance.  Appellant filed a
motion to quash the enhancement paragraph for the 1991 conviction on grounds
that though it was a third-degree felony in 1991, at the time of this trial
such a conviction was only a state jail felony.  The trial court denied
appellant=s request.  We review a trial court=s ruling on a
motion to quash under an abuse-of-discretion standard.  See Thomas v. State,
621 S.W.2d 158, 163 (Tex. Crim. App. 1981); Manning v. State, 112 S.W.3d
740, 742B43 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d).

Appellant was charged in the present case with three
second-degree felonies under Texas Penal Code section 49.08.  A felony offense,
as in this case, may not be enhanced by a state jail felony offense.  Jordan
v. State, No. 05-99-01620-CR, 2001 WL 118993, at *3 (Tex. App.CDallas Feb. 13,
2001, no pet.) (not designated for publication).  At the time of appellant=s 1991 conviction,
unauthorized use of a vehicle was a third-degree felony.  See Act of May
29, 1993, 73rd Leg., R.S., ch. 900, ' 1.01, 1993 Tex.
Gen. Laws 3586, 3606, 3640 (reclassifying the offense from a felony to state
jail felony); see also Castaneda v. State, 911 S.W.2d 773, 774 (Tex.
App.CSan Antonio 1995,
no pet.).  Appellant=s 1991 conviction was not a state jail
felony in 1991.  See Jordan, 2001 WL 118993, at *3; Castaneda,
911 S.W.2d at 775.

Effective September 1, 1994, the State reclassified the
offense of unauthorized use of a motor vehicle from a third-degree felony to a state-jail
felony.  Act of May 29, 1993, 73rd Leg., R.S., ch. 900, ' 1.01, 1993 Tex.
Gen. Laws 3586, 3606, 3640; see Castaneda, 911 S.W.2d at 774.  In
creating state jail felonies, the legislature specifically noted:

(a) The change in law made by this article applies only to an offense
committed on or after the effective date of this article.  For purposes of this
section, an offense is committed before the effective date of this article if
any element of the offense occurs before the effective date.  

(b) An offense committed before the effective date of this article is
covered by the law in effect when the offense was committed, and the former law
is continued in effect for that purpose.








Act of
May 29, 1993, 73rd Leg., R.S., ch. 900, '1.18, 1993 Tex.
Gen. Laws 3586, 3705; see Castaneda, 911 S.W.2d at 775.  Only offenses
committed on or after the effective date of the amendment, September 1, 1994,
are affected by the reclassification.  See Act of May 29, 1993, 73rd
Leg., R.S., ch. 900, ' 1.18, 1993 Tex. Gen. Laws 3586, 3705; Jordan,
2001 WL 118993, at *3.

The parties do not dispute that the 1991 offense, for which
appellant was convicted, was committed prior to the effective date of the
relevant amendment to the Penal Code.  Jordan, 2001 WL 118993, at *3. 
Appellant=s 1991 conviction is governed by the law in existence
at that time, and the law then classified the offense as a third-degree
felony.  See Act of May 29, 1993, 73rd Leg., R.S., ch. 900, '1.18, 1993 Tex.
Gen. Laws 3586, 3705; Jordan, 2001 WL 118993, at *3; Castaneda,
911 S.W.2d at 775.  The amendment that reclassified an offense for unauthorized
use of a motor vehicle from a third-degree felony to a state jail felony did
not affect the status of appellant=s 1991 felony
conviction for the same offense.  See Act of May 29, 1993, 73rd Leg.,
R.S., ch. 900, '1.18(b), 1993 Tex. Gen. Laws 3586, 3705;
Jordan, 2001 WL 118993, at *3; Castaneda, 911 S.W.2d at 775; see
also Ex parte Rice, 629 S.W.2d 56, 58B59 (Tex. Crim.
App. 1982) (providing that once a final felony conviction stands, it may be
used for enhancement even if the felony is later downgraded to a misdemeanor); Moreno
v. State, 541 S.W.2d 170, 174 (Tex. Crim. App. 1976) (considering final
convictions for felonies to be permissible for enhancement purposes even when
the current penal code defines the offense as a misdemeanor).  Appellant=s 1991 conviction
for a third-degree felony of unauthorized use of a motor vehicle was properly
used as an enhancement offense.  See Jordan, 2001 WL 118993, at
*3.  Accordingly, the trial court did not abuse its discretion in denying
appellant=s motion to quash.  See Manning, 112 S.W.3d at
744.  Therefore, we overrule appellant=s fifth issue.

 

 








The trial court=s judgment is
affirmed.[11]

 

 

 

 

/s/      Kem Thompson Frost

Justice

 

 

 

Judgment rendered
and Opinion filed July 22, 2008.

Panel consists of
Justices Fowler, Frost, and Seymore.

Publish C Tex. R. App. P. 47.2(b).

 

 









[1]  A person is considered to be Aintoxicated@ if
that person (1) does not have the normal use of mental or physical faculties by
reason of the introduction of alcohol, a controlled substance, a narcotic, a
dangerous drug, a combination of any of those substances, or any other
substance into the body; or (2) has an alcohol concentration in his breath,
blood, or urine of .08 or more.  Tex.
Penal Code Ann. '' 49.01(2)(A), (B) (Vernon 2003).





[2]  In his fourth issue, which we address below,
appellant argues that the trial court erred in admitting evidence that
appellant admitted to treating medical personnel that he drank too much alcohol
that evening.  However, in a sufficiency review, a reviewing court must
consider all evidence, whether properly or improperly admitted at trial, that
the jury was permitted to consider.  Moff v. State, 131 S.W.3d 485, 488,
489 (Tex. Crim. App. 2004).





[3]  In his second issue, which we address below,
appellant complains of the trial court=s
admission of testimony from the drug-recognition expert.  As noted, in a
sufficiency review, we consider all evidence, whether properly or improperly
admitted at trial, that the jury was permitted to consider.  Moff, 131
S.W.3d at 488, 489. 





[4]  Appellant filed a motion to suppress the results of
any blood tests on samples taken from him as well as any testimony concerning
toxicology tests performed on such blood samples.  The trial court granted
appellant=s motion to suppress results of the second blood test,
the sample for which was drawn from appellant in a police officer=s presence pursuant to the Texas Transportation Code. 
On appeal, appellant challenges only the results and expert testimony involving
the first blood sample.





[5]  See Bigon, 252 S.W.3d at 366B68 (analyzing blood-alcohol concentration using the
hospital=s blood-serum analysis and converting the results into
whole-blood analysis terminology); Morris v. State, 214 S.W.3d 159, 175B77 (Tex. App.CBeaumont
2007, pet. granted) (assessing the reliability of blood-test results from Kodak
Etchakem 750 in hospital=s blood-serum test); Garcia v. State, No.
08-03-00351-CR, 2005 WL 1488384, at *4B5
(Tex. App.CEl Paso June 23, 2005, no pet.) (not designated for
publication) (assessing reliability of blood-test results from LX-20 chemical
analyzer in hospital=s blood-serum test); Jessup v. State, No.
13-02-00024-CR, 2004 WL 2612958, at *3 (Tex. App.CCorpus Christi Nov. 10, 2004, no pet.) (mem. op., not designated for
publication) (holding blood-alcohol test results from analysis of blood serum
on Abbot Axsym Analyzer are reliable); Dean v. State, No.
04-97-00077-CR, 1998 WL 652322, at *3 (Tex. App.CSan Antonio Sept. 23, 1998, pet. ref=d)
(not designated for publication) (holding reliable blood-alcohol test results
from a ADu Pont aca analyzer,@ which analyzes reactions between enzymes and blood serum); Reidweg
v. State, 981 S.W.2d 399, 403B04
(Tex. App.CSan Antonio 1998, pet. denied) (holding blood-alcohol
tests using blood-serum are valid because taking such tests is common practice,
the results are more accurate, and the test results are standardized through
the testing instrument).





[6]  See United States v. Kent, No. 4:06-CR-42,
2007 WL 1752305, at *1B2 (M.D. Ga. 2007) (not designated for publication)
(admitting blood-test results from Dade Dimension Analyzer); United States
v. Mason, 143 F. Supp. 2d 1241, 1242B45
(D. Colo. 2001) (admitting blood-test results from Dade Dimension Analyzer).





[7]  After Petty testified, the State presented expert
testimony from a state forensic scientist, who analyzed the results of
appellant=s second blood-alcohol test.  This witness testified
that he is not familiar with the Dimension RXL, but that the instrument he
typically uses implements gas chromatography, which is a methodology he
characterizes as the Aworkhorse@ of
the forensics industry for testing alcohol.  He declined to say whether he believed
gas chromatography offered more accurate results.





[8]  Before trial, appellant filed a motion to suppress
statements he made to the paramedic on the premise that the paramedic, who
worked for Houston Fire Department, served in a law enforcement-custodial
capacity and appellant=s statements were the product of custodial
interrogation without proper Miranda warnings.  The trial court denied
the motion, and, on appeal, appellant does not challenge the trial court=s  ruling on this motion.  Moreover, the basis of
appellant=s motion to suppress, on grounds of improper custodial
interrogation, does not comport with appellant=s hearsay objection that he now raises on appeal.  See Tex. R. App. P. 33.1(a)(1)(A); Wilson
v. State, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (providing that
objection at trial must comport with objection on appeal); Rezac v. State,
782 S.W.2d 869, 870 (Tex. Crim. App. 1990) (providing an objection grounded on
one legal basis may not be used to support a different legal theory on appeal);
see also Roach v. State, No. 14-06-00756-CR, 2008 WL 1862479, at *2
(Tex. App.CHouston [14th Dist.] Apr. 29, 2008, no pet. h.) (mem.
op., not designated for publication) (failing to preserve error because
appellate contention did not comport with arguments made at motion-to-suppress
hearing). 





[9]  Appellant=s
motion to suppress his statements made to medical personnel involved only
statements made to the paramedic; the motion did not involve any statements
made by appellant to the nurse.  The nurse testified at a suppression hearing
regarding her participation in drawing a blood sample from appellant. However,
appellant did not complain of this particular testimony from the nurse at
either the suppression hearing or at trial.





[10]  Appellant does not complain on appeal that the nurse
testified to appellant=s statement to her admitting that he had Aa little too much@
alcohol to drink that night.





[11]  Because we affirm, we need not reach the merits of
the State=s cross-point in which the State argues the trial
court erred in suppressing the results of appellant=s second blood test, the specimen for which was drawn
pursuant to a mandatory blood-draw requirement of the Texas Transportation Code
section 724.012.